# District Court of the United States
# District of Columbia Washington, D.C.

Case: 1:16-cv-01513
Assigned To : Unassigned
Assign. Date : 7/27/2016
Description: Pro Se Gen. Civil (F Deck)

William Guy, 43 Fales Ave. Barrington,
Rhode Island 02806  Phone (401) 289-0806
a.k.a. "Sagamore Winds Of Thunder",
American Indian, duly elected Sagamore
of the Pokanoket Tribal Nation
       Plaintiff,

      V.

The STATE OF RHODE ISLAND, 82 Smith St.
#115 Providence, RI  02903, TOWN OF BRISTOL,
10 Court St. Bristol, RI 02809 TOWN OF
BARRINGTON,  283 County Rd. Barrington, RI
02806,and TOWN OF WARREN,514 Main St.
Warren, RI 02885,  BRISTOL COUNTY, Formerly
known as  SOWAMS in the State of Rhode Island,
 Individually, and as representatives of a DEFENDANT
class composed of all persons and entities et al.
      DEFENDANTs.

## VERIFIED COMPLAINT

## I. JURISDICTION

### PROTECTIONS AND RELIEF DEMANDED UNDER ARTICLE III JURISDICTION

The jurisdiction of the Court is invoked pursuant to <u>Jus Cogens</u> for breach of a peremptory

norm of international law, See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S.

252, 264–68 (1977). Cf. RECHTSCHAFFEN & GAUNA, supra note 75, at 49–53 (discussing

racism as a cause of environmental justice problems) and where Petitioner has protected status

of the victim and is a member of a discrete and insular minority, United States v. Carolene

Products Co., 304 U.S. 144, 153 n.4 (1938). See also Edward J. Erler, Equal Protection and

RECEIVED

JUN 3 0 2016

District & Bankruptcy

*1*

42      Personal Rights: The Regime of the "Discrete and Insular Minority," 16 GA. L. REV. 407

43      (1982), See, e.g., Soc. and Econ. Rights Action Ctr. for Econ. and Soc. Rights v. Nigeria,

44      Communication No. 155/96, African Commission on Human and Peoples' Rights (2001), at

45      paras. 44–48 (explaining that Nigeria has an obligation to refrain from interfering with rights,

46      to ensure that others respect rights, and to fulfill its obligations under human rights regimes to

47      protect rights and freedoms).

48

49      Plaintiff claims for relief under Jus Cogens and the Alien Tort Statute for violations of

50      international norms  causing the Destruction of Plaintiff's environment and the forced

51      assimilation and integration of the Plaintiff and Pokanoket people into colonial society, such

52      violations have had lasting negative influence on sustainable food, housing, land rights and

53      zoning patterns, and the colonial reshaping of race, power, and wealth dynamics, have all

54      caused and perpetuated environmental racism and to this extent, the DEFENDANTs

55      propagation of these policies have tolerated such discriminatory results, that DEFENDANT

56      state of Rhode Island has and continues to engages in patterns of systematic racism in violation

57      of Jus Cogens and the Alien Tort Statute.

58

59      Relief may be awarded pursuant to Law of nations. This Court has venue of this action because

60      the subject matter claims of (A) environmental deprivations of human rights, (B) particularly

61      vulnerable racial communities and (C) procedural environmental rights violations, and (D)

62      plaintiff's foreign aborigine status claims falls within the venue of the District Court of the

63      United States, Washington, D.C. under Jus Cogens and the Alien Tort Statute. G.A. Res

64      49/146, UN. Doc. No. A/RES/49/146 (Feb. 7, 1995) (reiterating that racism is one of the

65      world's worst problems); U.N. Econ. & Soc. Council, Comm. on Econ., Soc., and Cultural

66      Rights, *General Comment No. 20*, ¶ 2, U.N. Doc. E/C.12/GC/20 (July 2, 2009) ("Non-

67      discrimination and equality are fundamental components of international human rights law . . .

68      ."); Declaration on Race and Racial Prejudice, U.N. Educational, Scientific and Cultural

69      Organization (UNESCO), 20th Sess., gen. conf., U.N. Doc E/CN.4/Sub.2/1982/2/Add.1, annex

70      V (Oct. 17, 1982) [hereinafter UNESCO Declaration on Race]; Int'l Law Comm'n,

71      *Fragmentation of International Law: Difficulties Arising from the Diversification and*

72      *Expansion of International Law*, *33, U.N. Doc. A/CN.4/L.702 (July 18, 2006); Juridical

73      Condition and Rights of the Undocumented Migrants, Advisory Opinion OC-18/03, Inter-Am.

74      Ct. H.R. (ser. A) No. 18, ¶ 1 (Sep. 27, 2003) (Pesantes, J., concurring) ("[E]quality and

75    nondiscrimination are rights that form a platform on which others are erected"). Plaintiffs'
76    claims for relief also arise under the Supremacy Clause of the United States Constitution.

77
78    **PROTECTIONS AND RELIEF DEMANDED UNDER ARTICLE III JURISDICTION**
79

80    Plaintiff is a NON-RESIDENT INHABITANT of and FOREIGN NATIONAL to the State
81    of Rhode Island and Massachusetts, and Article III jurisdiction is essential to bringing proper
82    remedy to Plaintiff's Article III, Alien Tort Statute (ATS), Jus Cogens claim. The "UNITED
83    STATES DISTRICT COURT" lacks jurisdiction to issue "ORDER" in this matter.

84

85    Plaintiff received communication from the court, where the court has returned a claim filed
86    in January 2016. The return of the filing and rejecting the filing, appears to be an effort to derail
87    Plaintiff's claim. The actions of the Court has delayed this matter, and other efforts have gone so far
88    as to remove the previous Judge, Chief Justice Richard Warren Roberts, after Judge Roberts clearly
89    accepted Plaintiff's filings as proper.

90

91    Due to the perceived lack of understanding of Plaintiff's initial request for Law of Nations
92    jurisdiction, and the current actions of the Court in not fulfilling the obligation to uphold justice,
93    Plaintiff has found it necessary to explain to the Court, the foundation on which the District Court
94    of the United States, District of Columbia [Washington, D.C.] sits.

95

96    The Court is invited to go to UNITED STATES CODE and read first §91 and then examine
97    every other district court to find one ordained and established under Article III in all the continental
98    states of the United states. In "CHAPTER 5—UNITED STATES CODE, DISTRICT COURTS";
99    ending with the paragraph below: "HISTORICAL AND REVISION NOTES." If you were not
100   aware of pages 42 and 43 of Title 28 U.S.C., or if you have trouble reading or printing out these
101   pages, you can also access Title 28 U.S.C. by going to http://uscode.house.gov/title_28.htm.

102

103   Plaintiff asserts that the Court has gone too far and should be RECUSED from this case, and
104   all matters be "ORDERED" and served upon DEFENDANTS. This matter should be accepted with
105   the original filing date of January 7, 2016 and service of "Process" to DEFENDANTs without
106   delay. The District Court For The United States of America, District of Columbia [Washington,
107   D.C.] is the proper venue and Plaintiff has examined the statute law that created every United States

108     district court and has found only one instance where Congress appeared to ordain and establish an
109     Article III United States district court in any state.
110
111          In 1959, the Congress created an Article III United States district court for Hawaii, but made
112     no provision for Article III judges by specifically precluding the President from appointing them.
113     The Code specifically provides for territorial judges for the Hawaiian Article III court. Title 28
114     U.S.C.—Judiciary and Judicial Procedure has been enacted into positive law so the Code shows the
115     same kinds of courts as are found in the statutes. Chapter 5 of Title 28 U.S.C.—District Courts
116     consists of Sections 81 through 144. The names of all 50 states of the Union will be found from
117     Sections 81 to 131 and in addition in Section 88 will be found the District of Columbia and in
118     Section 119 Puerto Rico.
119
120          The nature of the astounding revelations in this matter obviously requires this unique format
121     where facts are presented in support of the proposition that a non ARTICLE III court existing in
122     any state of the Union cannot exercise Article III judicial power. This kind of presentation invites
123     facts that proves this position.
124
125          Plaintiff provides as an example of a fact: Title 28 U.S.C. is territorial law; this fact will be
126     supported by material found in the notes to §91. Those in federal litigation, or who are
127     contemplating that exercise, should be aware that legal justice is available only from courts that
128     have judicial power. Any litigant in any United States district court in any state of the Union is
129     warned that these courts have no Article III, Section 2 judicial power, whatsoever.
130
131          The United States district courts of the several states are not judicial courts and the judges
132     that sit in those courts are not Article III judges and these judges cannot adjudicate matters of
133     ARTICLE III. These Judges of these courts are appointed for life terms, but obtain judicial powers
134     only when appointed to judicial courts with Article III power.
135
136          District courts and district court judges of the United States have been mistaken for Article
137     III courts and judges since the Judiciary Act of 1789. The mistaken belief that a court has
138     jurisdiction is sufficient to confer it when everyone is equally mistaken; but that jurisdiction
139     remains what it is and not what it is mistaken to be.

140        Names are labels, and like book covers, do a notoriously bad job of identifying contents, and
141    just as a book cannot be accurately judged by its cover, a federal trial court is not accurately
142    described by the name of the state where it is located. The names of the federal trial courts in the
143    several states are labels that are fully explained in the first sentence of the "Historical and Revision
144    Notes" that are part of the law: "Sections 81—131 of this chapter show the territorial composition
145    of districts and divisions by counties as of January 1, 1945." Since the conclusion of the Civil War,
146    the States of the Union are the federal territory within the state and the state officers who have taken
147    an oath to uphold the United States Constitution.
148

149        The subject matter of Chapter 5 of Title 28 U.S.C. is the territorial composition of districts
150    and divisions by counties as of January 1, 1945. Of the courts named in Sections 81—131, which
151    can only be the areas subject to the exclusive jurisdiction of the United States—federal territory,
152    these areas consist of places like the national parks, military bases, federal buildings and federal
153    courthouses. Crimes that occur on or in these federal places are federal crimes, and the federal
154    courts for the districts are the proper forum for trials of those crimes. Article III judicial power is
155    not needed for those courts, and those courts are certainly without such power. There is no room for
156    legalistic interpretations of Chapter 5.
157

158        The only legislation, since the first judiciary act on September 24, 1789, to create an Article
159    III United States district court is found in §91 of Title 28 U.S.C. This section documents the change
160    of a territorial court to an Article III court, without actually giving the court Article III judicial
161    power. Nothing can be done to change the nature of these courts in the several states without the
162    direct intervention of Congress by legislation.
163

164        A judge without judicial power can do nothing to change the jurisdiction of the court where
165    he presides. Any litigant or Petitioner in any federal court proceeding, who attempts to have the
166    United States district court consider the issues raised in action, should be aware that the American
167    Law Institute's Restatement of Judgments, holds that such a litigant is bound by the court's ruling.
168    A federal judge sitting in a trial court in any United States district court is without judicial power,
169    while such an official can be a life-tenured bureaucrat, such an official cannot be expected to rule
170    other than administratively.
171

No United States district court (legislative) in any state may lawfully exercise Article III court power. *The lawful jurisdiction of the federal district court (Article III) or courts is limited to those places where Congress has exclusive jurisdiction.* It is also clear that federal judges and federal courts have been used in the past by the federal government to create the appearance of an Article III tribunal, but the transferring of an Article III judge to a state territory, does not create an Article III court or jurisdiction. The federal courts within the several states, known as United States District Courts are federal and territorial, in that, these courts implement administrative law on territory exclusively under the jurisdiction of the United States of America *Corporate / legislative*, and not Congress *Constitutional*. ARTICLE III is the jurisdiction for ATS and Jus Cogens claims brought by American Aborigine, the American Indian, the Plaintiff.

Article III judicial power imposes self-restraint on judges. Only judges appointed to Article III courts may exercise the judicial power of the United States found in Article III, Section 2. Judicial power imposes restraints on the judges that have it and that serves as some protection from judicial abuse, which includes refusing to accept the properly filed "Pauperis" and the court's deliberately delaying justice; such actions by this court are unlawful and will be reported to the Appeals Court.

All justices appointed to the Supreme Court of the United States are genuine Article III judges, and the Aborigine rights of Plaintiff are established under Article III jurisdiction, therefore the demand for proper jurisdiction must be met in an Article III Court.

Plaintiff is not learned in the ways of law, so Plaintiff finds elation in and relief from knowing, through vigorous research, that the court has rushed to judgment and has violated Plaintiff's rights and now must correct. Judges of other than judicial courts, of course, have no constitutional judicial power and tend to be extremely rigid in the way they administer their "judicial business", and often make errors following legislative policy. These judges are, or can be, called territorial, legislative or administrative, and Plaintiff now understands that the administrative efforts and demands made by the Court and the Clerk are made in violation of Article III protections guarantees, and those administrative demands are herein challenged.

205        Lawyers and judges must be aware of the true nature of the courts they practice and preside
206   in. Everyone must be made aware that the United States district courts established in California and
207   in 48 other states by United States Statute are not Article III courts, therefore this issue should be
208   dismissed in the instant.
209

210        Lifetime tenure fuels the universal presumption in the legal academic community that the
211   federal districts courts are Article III courts, and that the judges that sit in those courts are Article III
212   judges. Because of Article 4-Congress can make law locally or nationally, and it must be presumed
213   that law, enacted by Congress is territorial in scope rather than national, *Foley Bros. Inc. v. Filardo*
214   *336 U.S. 281(1949)*, unless a contrary intent is shown in the legislation itself. The legislation
215   creating the district court for Hawaii is a clear example of the presumption and an example of a
216   national legislative intent to create an Article III court.
217        Congress has provided that territorial Title 28 U.S.C. judges be appointed to the United
218   States district court (legislative) for the district of Hawaii, and are to be appointed to an Article III
219   court. *The district judges for the district of Hawaii are specifically to be appointed by the President*
220   *pursuant to sections 133 and 134 of title 28, United States Code, as officers of the United States,*
221   *but not as judges of an Article III court*. These two sections are also to be used in appointing any of
222   seven judges of the Puerto Rico district should a vacancy occur there. It can be deduced that
223   appointment pursuant to § 133 and 134 of Title 28, will always produce territorial judges.
224

225        The Hawaii judicial district established in § 91 of the Judicial Code of 1948 was a territorial
226   court. The United States District Court of Hawaii is not a true United States court established under
227   Article III of the Constitution to administer the judicial power of the United States, Balzac *v. Porto*
228   *Rico, 258 U.S. 298, 312 (1922)*. In *Balzac*, Chief Justice William Howard Taft stated that United
229   States District Court for *Arecibo*, Porto Rico, as Puerto Rico was known then, "created by virtue of
230   the sovereign congressional faculty, granted under Article IV, § 3, of that instrument, of making all
231   needful rules and regulations respecting the territory belonging to the United States."
232

233        Puerto Rico is the Commonwealth of Puerto Rico and it has not been incorporated into the
234   United States though its inhabitants are United States citizens. The inclusion of Puerto Rico in
235   Chapter 5 as § 119 does not make the district court for Puerto Rico an Article III court, because
236   Puerto Rico has not been incorporated into the Union. Puerto Rico fits comfortably among the

237 names of the 50 states because the geographical areas are mini federal territories or federal
238 enclaves.
239
240     <u>Only Hawaii has an Article III district court, and that court cannot function as one, because</u>
241 <u>no ARTICLE III judges are appointed to that court; no other state has an Article III court</u>. The
242 federal district courts of RHODE ISLAND, MASSACHUSETTS, NEW JERSEY AND
243 PENNSYLVANIA fall squarely within the mold of the federal courts of the 49 states that have no
244 Article III district courts where matters of Jus Cogens under Alien Tort Statute claims must be
245 addressed.
246
247     The use of the term, "district courts of the United States" refers to Article III courts. There
248 are no more than two "district courts of the United States." There is no doubt that the district court
249 for Hawaii is an Article III court—that's one. The § 88 court for the District of Columbia is another.
250
251     The Historical and Revision Notes to that section make it clear that the District of Columbia
252 district court is a constitutional court established and ordained under Article III. The existence of at
253 least two "district courts of the United States" permits the general usage of language that refers to
254 the "district courts of the United States" as Article III courts.
255
256     Legal scholars assume without justification that the federal district courts are Article III
257 courts. Plaintiff has discovered, and proven, that no responsible public federal officer has ever
258 publically questioned these assumptions. In all the legal literature that Plaintiff examined, the status
259 of the United States district courts as Article III was assumed despite all the contrary authoritative
260 evidence.
261
262     The United States Supreme Court in two cases: Balzac v. Porto Rico, 258 U.S. 298 (1921)
263 and Mookini v. United States, 303 U.S. 201 (1938) made it clear that a ***"district court of the United***
264 ***States" described a court created under Article III*** and a ***"United States district court" described***
265 ***a territorial court***. The former identified a constitutional court of the United States exercising the
266 judicial power of the United States and the latter merely identified a court for a district of the
267 government of the United States.
268

269      The United States district courts are territorial and without judicial power. This has been so since

270      the Judiciary Act of 1789. As such, the United States District Court for the District of Rhode

271      Island, Massachusetts, New Jersey and Pennsylvania lack the jurisdiction to properly address

272  Plaintiff's claim and must provide an Article III Judge in an Article III venue with haste. The proper

273   venue for addressing Plaintiff's Law of Nations claims is in the District Court of the United States

274                of America, District of Columbia {Washington, D.C.].

## II. Nature of the Action

278      Plaintiffs, William Guy of the Pokanoket Nation, (the "Plaintiff") bring this claim to resolve

279      issues of environment racism, genocide and slavery against the tribal and individual rights of

280      Plaintiff on Plaintiff's historical lands located generally in what is called Town of Bristol,

281      Town of Warren and Town of Barrington, formerly known as SOWAMS, located in what is

282      now called the "State" of Rhode Island where Plaintiff and members of the Pokanoket Tribal

283      Trust Indian Nation have inhabited since and before colonial times, lands which were reserved

284      for the sustainable usage by the Aborigines occupying the territory; now illegally used,

285      inhabited and thereafter wrongfully taken from the ancestors of Plaintiff by the DEFENDANTs

286      in violation of Law of Nations, Customary international law and Alien Tort Statutes.

287      Under the Alien Tort Claims Statute, Jus Cogens and Law of Nations, Customary International

288      Law of Human Rights – Foreign Relations Law Section 702.

290      Plaintiff seek the repatriation of specific lands which are under environmental devastation, and

291      has been under environmental abuse and assault since the subject lands were forcefully taken as

292      a means to enrich the DEFENDANT State, while racially selecting, subjugating and killing the

293      aborigine inhabitants, deliberately destroying Plaintiff's culture, means of livelihood and very

294      existence, through means of physical and paper genocide, piracy, racial suppression and

295      discrimination, through systemic environmental racism targeting Plaintiff's ancestors and has

296      now placed *an extreme concentration of environmental burdens upon Plaintiff* and Plaintiff's

297      family, and the proof herein demonstrates Plaintiff's entitlement; DEFENDANTs' placing of

298      extreme environmental burdens on Plaintiff is in violation of *U.S. Environmental Protection*

299      *Agency's* definition of environmental justice, requires that "no group should bear a

300      disproportionate share of negative environmental consequences". Plaintiff makes claim of

301    DEFENDANTs' violations of the International Covenant on Economic, Social and Cultural
302    Rights (ICESCR) and the Universal Declaration of Human Rights (UDHR).
303
304    Plaintiff claims against DEFENDANTs for damage and destruction of safe and productive
305    habitat and environment; unlawful possession of lands; which DEFENDANTs have been
306    unjustly enriched by reason of the illegal taking of the subject lands; Plaintiff is denied the free
307    unencumbered right to use ancestral lands for ceremonies and cultural gatherings in violation
308    of Plaintiff's rights to own, develop, and use traditional lands and resources; Plaintiff has
309    suffered insurmountable human rights violations as a consequence of land rights violations and
310    environmental degradation which are inseparable from the DEFENDANTs' taking of the
311    subject lands, forcefully removing Plaintiff's ancestors under racists doctrines, in violation of
312    the ICERD (International Convention on the Elimination of All Forms of Racial
313    Discrimination), UNESCO (United Nations Educational, Scientific and Cultural Organization)'
314    Declaration on Race, also *See, e.g., Maya Indigenous Cmtys. of the Toledo District v. Belize*,
315    Case 12.053, Inter-Am. C.H.R., Report No. 40/04, ¶ 163 (2004),
316    Plaintiff is denied procedural environmental rights in violation of United States Presidential
317    Executive Order 12,898, which mandates that Procedural environmental rights include access
318    to environmental information, meaningful participation in environmental decision-making, and
319    access to legal redress for environmental wrongs, Plaintiff has been denied redress at every
320    governmental agency under DEFENDANTs control and authority. Plaintiff further alleges that
321    the denial of access to culture through denial of access to cultural lands has created an
322    *International Covenant on Civil and Political Rights (ICCPR)* Article 27 treaty violation and
323    the failing to ensure minority rights in this context, the DEFENDANTs et al has enacted
324    systematical racist actions and engages in environmental racism; Plaintiff further alleges that
325    discrimination is deemed systematic because the DEFENDANTs et al stripped his ancestors
326    and Plaintiff of land on which they and Plaintiff have lived since time immemorial.
327
328    Plaintiff also makes claim under Federal and State common law and in violation the Indian
329    Trade and Intercourse Act, 25 U.S.C.A. § 177 (the "Nonintercourse Act"), and that the
330    purported taking of the subject lands by the DEFENDANTs as described herein was void ab
331    initio. The CERD reinforced this holding in 2005, finding that New Zealand discriminated
332    against indigenous peoples by extinguishing the possibility of establishing customary titles and
333    failing to guarantee a right of redress for that wrong; Plaintiff asserts DEFENDANTs claim and

U.S. Congressional ruling to extinguish aboriginal title in Rhode Island is systematic discrimination and resulting from acts of environmental racism. The CERD also influenced the ruling in *Mabo v. Queensland II*, when the high court struck down the doctrine of *terra nullius*, upon which British claims to acquisition of Australia were based; the *Mabo* cases have informed a number of other national high courts around the world, leading them to recognize the validity of native title and adding to the level of acceptance of the prohibition of environmental racism; Plaintiff's property and procedural rights suffer inequitably from careless non-compliant actions of discriminatory interference committed by the state of Rhode Island and DEFENDANTs et al systemically.

DEFENDANTs are sued individually, as more fully defined below, and as representatives of a DEFENDANT class (the "Landholder Class") composed of all persons and entities (including each named DEFENDANT) that currently occupy or have or claim an interest in any of the subject lands and their successors and assigns, as more fully defined below.

## Standard of Jurisdictional and International Norms

**U.N. Human Rights and Environment Report**, *supra* note 2, ¶ 175 (citing R.G. Ramcharan, The Right to Life 310–11 (1983)) (stating that criminal and civil international law liability may arise from environmental harm that threatens the right to life); Collins, *supra* note 125, at 129 (suggesting environmental deprivations of rights have become customary international law because of recognition of this concept by international, regional, and domestic courts). Amici in *Flores* argued that environmental deprivations of rights violate customary international law, but their assertions are unlikely to be persuasive given *Flores*' sound rejection of their authority. Flores v. S. Peru Copper Corp., 414 F.3d 233, 265 (2d Cir. 2003) (citing The Paquete Habana, 175 U.S. 677, 700 (1900)). *Compare* Collins, *supra* note 125, at 129 (suggesting, without expressly stating, that environmental deprivations of rights are censured under customary international law) *with* Cohan, *supra* note 131, at 154 (stating that there is "little doubt" that indigenous peoples' environmental rights are protected under customary international law). *See* Sarah Krakoff, *Tribal Sovereignty and Environmental Justice, in* Justice and Natural Resources: Concepts, Strategies, and Applications 161, 167 (Kathryn M. Mutz et al. eds., 2002) (noting the similarities between African American and Native American

11

struggles for environmental justice); Kathryn M. Mutz, *Mineral Development: Protecting the Land and Communities*, *in* Justice.

The **Stockholm Declaration**, discussed *supra* in Part III.A, speaks to the widespread acceptance of the prohibition on environmental racism. It impliedly prohibits environmental racism by recognizing the fundamental right to equality in an environment that permits a life of dignity and well being. Stockholm Declaration, *supra* note 57, at 4 at princ. 1. The United Nations acknowledges that "Principle 1 of the Stockholm Declaration established a foundation for linking human rights and environmental protection." Joint United Nations Environmental Programme-Office of the High Commissioner of Human Rights Expert Seminar on Human Rights and the Environment, Geneva, Switz., Jan. 14–16, 2002, Human Rights and Environment Issues in Multilateral Treaties Adopted between 1991 and 2001 (prepared by Dinah Shelton), @ ohchr.org/english/issues/environment/environ/bp1.htm; accord U.N. Human Rights and Environment Report, supra note 2, ¶¶ 32, 50.... The 1992 Rio Declaration, issued 20 years after the Stockholm Declaration, reaffirms the international community's commitment to these principles. *See* Rio Declaration, *supra* note 53,

The **African Charter and the San Salvador Protocol** provide the same principle on a regional level within Africa and the Americas, respectively, by recognizing the right to environment alongside the obligation of non-discrimination. Together, these concepts prohibit environmental deprivations of rights. African Charter, *supra* note 81, art. 2 (non-discrimination), art. 21 (right to environment); Organization of American States, Additional Protocol to the American Convention on Human Rights in the Area of Economic, Social and Cultural Rights art. 3 (obligation of non-discrimination), art. 11 (right to environment), Nov. 17, 1988, O.A.S.T.S. No. 69 (entered into force Nov. 16, 1999) [hereinafter San Salvador Protocol]. The Restatement recognizes the existence of regional customary international law. Restatement (Third) of Foreign Relations Law of the United States § 102 cmt. e (1987).

The **Apartheid Convention**'s definition of "the crime of apartheid" includes any measure designed to divide the population along racial lines, including the expropriation of property and labor exploitation of a racial group. Both the Apartheid and Genocide Conventions prohibit the deliberate imposition on a racial group of living conditions calculated to cause its physical destruction. Such conditions would surely entail violations of social and economic rights, for

399    example, the rights to life, health, housing, or food. By prohibiting the larger wrong, therefore,
400    the international community also sought to prohibit the lesser wrongs included therein. The
401    Conventions thus seek to prevent environmental deprivations of rights, especially the rights to
402    life, health, and property. Apartheid Convention, *supra* note 77, art. II(d) (expropriation of
403    property), art. II (e) (labor exploitation). The Apartheid Convention limits its definition of
404    group solely to racial groups, while the Genocide Convention contains a slightly broader
405    definition. Apartheid Convention, *supra* note 77, art. II(b); Genocide Convention, *supra* note
406    80, art. II(c) (defining "group" as shared national, ethnic, racial or religious origin). For a
407    discussion of the intent requirements of the Apartheid and Genocide Conventions, see *supra*
408    note 94. Apartheid and Genocide Conventions, establishes that discriminatory expropriation of,
409    or interference with, property is a form of environmental racism.

410
411    **International Convention on the Elimination of All Forms of Racial Discrimination**
412    (ICERD) and the International Convention on the Suppression and Punishment of the Crime of
413    Apartheid (Apartheid Convention). Stephens et al., *supra* note 9, at 203. These agreements are
414    relevant to proving that racial non-discrimination is a norm of customary international law;
415    however, as the Restatement cautions, it is only systematic racial discrimination, practiced by
416    the state as a matter of state policy, that violates customary international law. Restatement
417    (Third) of Foreign Relations Law of the United States § 702 cmt. i (1987); *see supra* notes 69–
418    70 and accompanying text. International Convention on the Elimination of All Forms of Racial
419    Discrimination, *opened for signature* Dec. 21, 1965, S. Exec. Doc. C, 95-2 (1978), 660
420    U.N.T.S. 195 (entered into force Jan. 4, 1969) [hereinafter ICERD]; *see* Kevin Boyle &
421    Anneliese Baldaccini, *A Critical Evaluation of International Human Rights Approaches to*
422    *Racism, in* Discrimination and Human Rights. Racism 135, 149 (Sandra Fredman ed., 2001)
423    (noting that ICERD was the most widely ratified international human rights treaty until 1993,
424    when the Convention on the Rights of the Child surpassed it). Notably, the ICERD imposes
425    duties on States Parties that are "more than merely promotional," Schwelb, *supra* note 1, at
426    1016, which adds to its authority. *See* Jeffrey M. Blum & Ralph G. Steinhardt, *Federal*
427    *Jurisdiction Over International Human Rights Claims*, 22 Harv. Int'l. L.J. 53, 89 (1981)
428    (noting that the most authoritative international norms are those that create immediate legal
429    obligations, as compared to non-obligatory norms that merely encourage appropriate action).

430

431 **Restatement (Third) of Foreign Relations Law of the United States** §§ 102(3), 102 cmt. i,
432 Introductory Note to Part VII (1987); *see* Stephens et al., *supra* note 9, at 67 (noting that
433 widely ratified international agreements, even those that are non-binding, may reflect a norm of
434 customary international law); Blum & Steinhardt, *supra* note 76, at 89 ("Obligatory norms
435 typically are expressed in numerous international instruments, including those that are most
436 authoritative in that they reflect a broad consensus of states."). This may be true even when
437 agreements do not purport to codify customary international law. Restatement (Third) of
438 Foreign Relations Law of the United States § 102 reporter's note 5 (1987).

439
440 The **SOSA NORM for Environmental Racism in International Law**; environmental
441 deprivations of rights are censured in both the Inter-American and African regional human
442 rights systems and decried and defined most strongly by the CESCR. Protection against
443 environmental racism targeted at indigenous peoples and their property rights is strong across
444 the world, as evidenced by Inter-American, HRC, and CERD jurisprudence as well as
445 Australia's *Mabo* decision and its numerous successors in other countries. Similar protections
446 have been extended to prevent discrimination in procedural environmental rights, with the
447 Inter-American system, the HRC, and Botswana as examples. As a whole, judicial decisions
448 evince an especially strong protection of the right to property and procedural rights. The
449 number of decisions suggests that the norm prohibiting environmental racism is widely
450 accepted, as *Sosa* requires. By condemning concrete instances of environmental racism, these
451 decisions suggest that the norm has definite content, thereby meeting *Sosa*'s first prong.

452
453       **III. DESCRIPTION OF SUBJECT LANDS**
454
455 The lands claimed in this litigation (the "subject lands" or "Indian Lands") are located at
456 Bristol County, Longitude 41.7000 N, Latitude 71.2800 W, more or less, in the Northeast
457 section of the State of Rhode Island, including watersheds, mineral deposits, timber, fishing
458 rights, and all other assets which run in or upon the land in said area which defines part of the
459 Tribe's aboriginal territory as above described called Sowams, said title to which never having
460 been deeded out by said Plaintiff or members of Plaintiff's tribe, nor have Plaintiff's rights
461 been lawfully extinguished specifically by any federal law or otherwise.
462

463     Through the actions of the colonists placing many members of the Tribe into exile in many
464     areas as far away as the West Indies, subjecting members of Plaintiff's family to murder,
465     banishment, slavery servitude and other illegal actions by the colonists, and that much of such
466     land was taken over by the colonists through wrongful encroachment. This said area came
467     within the jurisdiction of the colony of Rhode Island pursuant to the Charter of King Charles II
468     dated July 15, 1663 and the laws remained in that posture until the enactment of the Rhode
469     Island Constitution in 1842 wherein the said Charter became part of the Constitution, which
470     simply absorbed the lands as part of the state of Rhode Island.

471
472     When DEFENDANTs became established as conquerors of the lands of Plaintiff and his
473     family, the lands were vibrantly and abundantly productive, providing a sustained quality for
474     human existence, but today these lands are considered by the United States based, Toxic
475     Action Center, as one of the most toxic and polluted places in America. Since the taking of
476     Plaintiff's ancestral lands the State of Rhode Island has nearly destroyed the once sustainable
477     environment.

478
479     Today, Rhode Island currently has 200 sites that are suspected hazardous waste disposal sites
480     and12 hazardous waste sites included on the United States National Priorities List, which are
481     the sites ranked nationally as posing the worst threats to human health and the environment.
482     Rhode Island also has some of the worst air quality in the nation, as well as rivers and lakes
483     polluted by industrial contaminants and toxic mercury. Asthma and cancer rates are some of
484     the highest in the country, and both can be linked to environmental causes

485
486     Additionally, members of Plaintiff's family and membership are subjected to acceptance of
487     state subsidized housing and apartment dwellings and lands attached, which are dangerously
488     filled with toxic molds and other contaminants from years of industrial and commercial toxic
489     textile mill run-offs, causing deprivation through overt systematic environmental racism,
490     neglect and abuse.

491
492                              **IV PARTIES**

493
494     Plaintiff, William Guy (the "Plaintiff"), is a Non-resident Inhabitant, Foreign National to the
495     state of Rhode Island and Massachusetts, acting as trust authority and Chief (Sagamore) of the

| 496 | Pokanoket Tribal Trust, individually a descendant and heir of the original aborigine described |
| 497 | in a deed from Wamsutta a/k/a Alexander to Thomas Willett, dated April  8, 1661 (the |
| 498 | "Deed"), and as an American National whose lands, culture, religious beliefs, heritage have |
| 499 | been taken and dispossessed of illegally under the Constitutions of the United States and the |
| 500 | State of Rhode Island, which had followed the Charter of Rhode Island of 1663 from King |
| 501 | Charles II giving the aborigines certain ownership guarantees to the use and possession of their |
| 502 | lands. |
| 503 | |
| 504 | Plaintiff, the Pokanoket Tribal Trust, is an aborigine tribe, band, clan, family or entity |
| 505 | recognized by the State of Rhode Island, with activities in Rhode Island and Massachusetts. |
| 506 | As used in this complaint, "Plaintiff Tribe" shall also include the Pokanoket Tribal Trust, and |
| 507 | one, some or all of the Pokanoket Tribal Trust aborigine tribes located within the subject lands |
| 508 | in 1661, and which had members that had inhabited and settled upon the subject lands. |
| 509 | |
| 510 | Plaintiff Tribe is identical to or is a political successor in interest to the aboriginal Indians at |
| 511 | Sowams, which were members of the Pokanoket Nation but forced under penalty of death to |
| 512 | use the name Wampanoag, and which occupied the subject lands from time immemorial.  At |
| 513 | all relevant times and up to the present, Plaintiff Tribe or its predecessors in interest have |
| 514 | continuously maintained tribal relations.  Plaintiff Tribe is a pre-colonial era aborigine group |
| 515 | whose entitlement has never been terminated or abandoned. |
| 516 | |
| 517 | Plaintiff is the direct descendent and heir of King Phillip of the Pokanoket Nation and sixth |
| 518 | great grandson of Simeon Simon, direct descendant of original aborigine inhabiting lands |
| 519 | described above as SOWAMS. |
| 520 | |
| 521 | DEFENDANT Town of Bristol (the "Town") is a municipal corporation organized and |
| 522 | existing under the laws of the State of Rhode Island.  The Town currently claims title to and |
| 523 | occupies portions of the subject lands. DEFENDANT Town of Barrington (the "Town") is a |
| 524 | municipal corporation organized and existing under the laws of the State of Rhode Island.  The |
| 525 | Town currently claims title to and occupies portions of the subject lands. |
| 526 | |
| 527 | DEFENDANT Town of Warren (the "Town") is a municipal corporation organized and |
| 528 | existing under the laws of the State of Rhode Island.  The Town currently claims title to and |
| 529 | occupies portions of the subject lands. |

530     DEFENDANT State of Rhode Island (the "State") has no deed, title or bill of sale showing
531     valid acquisition of the subject lands from the Pokanoket. The State currently claims title to
532     and keeps Plaintiffs out of possession of portions of the subject lands. The State also acted as
533     the trustee of the subject lands, and purported to authorize the Towns to acquire portions of the
534     subject lands.
535
536     The DEFENDANTS, the State of Rhode Island, the Town of Warren, the Town of Bristol
537     and the Town of Barrington are sued both individually and, pursuant to Rules 23(a) and (b)(1)
538     of the Federal Rules of Civil Procedure, as representatives of the DEFENDANT class (the
539     "Landholder Class"), composed of all persons or entities that occupy or have or claim an
540     interest in any of the subject lands and their successors and assigns as of the filing of this
541     complaint.
542
543     The number of members of the DEFENDANT class is approximately 10,000 or more
544     persons and is thus so numerous that joinder of all members is impracticable. There are
545     questions of law and fact common to the members of the DEFENDANT class, and the
546     defenses of the named representatives are typical of the defenses of the class. The
547     representative DEFENDANTs will fairly and adequately represent the interests of the
548     DEFENDANT class.
549
550     The prosecution of separate actions against individual members of the DEFENDANT class
551     would create a risk of adjudications with respect to individual members of the class which
552     would as a practical matter, be dispositive of the interests of the other proposed class members
553     or substantially impair or impede their ability to protect their interests.
554

555     # V POINTS AND AUTHORITY

556     From time immemorial down to the time of the colonial invasion of the first settlers in
557     New England, Plaintiff's family and members of the Pokanoket Tribal Trust were a prosperous
558     and powerful society. Numerous Pokanoket villages thrived throughout Sowams, Rhode
559     Island and southeastern Massachusetts taking advantage of the fertile soils and abundant
560     resources of the sea. Plaintiff's tenth great grandfather 'Massasoit was the chief of the
561     Pokanoket Nation, with a territory extending from the eastern tip of Cape Cod through
562     southeastern Massachusetts and Rhode Island to the Connecticut River, and north to the

563      Charles River. Massasoit (also known as Ousamequin) lived in what is now Bristol, Rhode
564      Island, then called Sowams and later named the Town of Barrington and Town of Warren,
565      Rhode Island. During this period of time, the Tribe and its members were living, possessing
566      and using the lands which are the subject of this complaint.
567
568      Plaintiff's great grandfather, Massasoit led his nation and greeted the European Pilgrims
569      arriving in Plymouth, Massachusetts. He met with the leaders of the Pilgrims and provided
570      them with food and shelter and other information necessary for their survival. He entered into
571      a fifty year treaty with the Pilgrims in 1621, assuring the peaceful coexistence of the colonists
572      and the Pokanoket Indians.
573
574      According to the writings of Rhode Island official, Roger Williams, Massasoit
575      welcomed the colonists with open arms. He allowed them the use of all the land they needed.
576      Unfortunately, with the coming of the colonists came much hardship for the Plaintiff's
577      ancestors. Soon after the arrival of the colonists, thousands of Pokanoket were swept away
578      through a terrible and fatal pestilence of plague and disease which had been brought by the
579      colonists, and for which the Indians had no immunity.
580
581      Plaintiff's tribal family has inhabited the subject lands for many years. As the colonists
582      took more and more territory the Natives were forced into smaller areas. The colonist
583      expansion continued to intrude on the lands of the Pokanoket, and tensions mounted. King
584      Philip, Massasoit felt trapped by the colonists and began to defend his lands.
585
586      In 1675 and 1676, the King Phillip War against the colonist occurred. Many battles
587      were fought on the subject lands, as the Natives tried desperately to hold on to one of their last
588      refuges. At the end of the war, Sir Edward Randolph, an emissary from the King of England
589      was dispatched to the colonies to determine the cause of this conflict. After his investigation,
590      Edward Randolph issued a report to the King entitled the "Eighth Inquiry", wherein he
591      determined that the cause of the conflict was mostly the fault of the Colonists and not the
592      Indians. He stated that at the end of the war, the government of Boston concluded a peace with
593      the Indians stating that "all Indians have liberty to sit down at their former habitations without
594      let." It is to be noted that subsequent to this war, the Colonists illegally abducted many Indians
595      including family members of the Pokanoket from their various lands

596    Many Pokanoket members were sold into slavery, deported to various countries,
597    especially the West Indies, and many others were massacred. This was a wrongful genocidal
598    act against the Pokanoket and the beginning of acts of apartheid and the illegal taking of the
599    lands of Sowams, which the State of Rhode Island holds no valid deed.

601    The Pokanoket Indians were forcibly driven from their lands illegally by the colonists,
602    who simply moved in after the murder and beheading of the Massasoit by the colonist. The
603    area of the subject lands known as "Sowams" which were taken after remaining members of
604    King Philip's family gathered and taken to what is now known as Connecticut; Plaintiff's
605    people were placed on the Shetucket Reservation.

607    On October 19, 1694 the Massachusetts Bay Colony approved the formation of the
608    North Purchase lands as the town of Attleborough, which included the Indian Lands, which at
609    the time became known as the Attleborough Gore. A controversy ensued between Rhode
610    Island and Massachusetts over control of the Attleborough Gore. Rhode Island claimed control
611    of this land based upon its Charter from King Charles II dated July 15, 1663. This controversy
612    continued until in 1746 when King George II in council detached the Attleborough Gore from
613    Attleborough and annexed it to the county of Providence, and named the area Cumberland
614    within the colony of Rhode Island.

616    Plaintiff alleges that as a dark aborigine he and his family were ordered not to use their
617    cultural name of Pokanoket under the penalty of death, leading to the false identifier called
618    "Wampanoag", and later through paper genocide, fraudulently misclassified as "colored" in
619    birth records, creating the appearance that Plaintiff's family were indentured negroes, for the
620    purpose of taking Plaintiff's land and rights of aborigine heritage, leading to the intentional
621    taking and destruction of natural lands and resources, which have been enjoyed by Plaintiff and
622    Plaintiff's tribe since before European incursion.
623    Current racial discrimination actions and tactics also forbids Plaintiff from performing sacred
624    ceremonies at the historical location where Plaintiff's great grandparents held council and lived
625    for more than 800 years; the same lands which are now contaminated with sludge, toxins, oil
626    run-off and whose water way is pollution filled and unusable for wildlife nor human
627    sustainability.

The Charter of Rhode Island and Providence Plantations granted on July 15, 1663 (the "Charter"), annulled all prior claims to Indian lands by right of discovery or conquest. The Charter provided that all Indian land titles were held by the Indians; and upon any conveyance from the Indians, title must be confirmed and established by royal consent throughout Rhode Island. The Charter clearly recognized the absolute title to the Indians of all Indian lands, and the responsibility of the government to direct the process when purchases were made from the Native Indians. The subject lands were never conveyed by the Indians to any colonist in conformity with the Charter, the Constitution of Rhode Island or the United States. There has never been any agreement to sell or transfer the aborigine ancestral lands that are being occupied.

The DEFENDANT State, Town and the City occupied, and continue to occupy, the Indian Lands. Upon information and belief, they have severed timber, minerals, and other valuable resources from the subject lands, and they continue to do so. Upon information and belief, they have inflicted damage, pollution, and destruction upon the subject lands, and they continue to do so.

Plaintiff's ancestors have sought redress of the wrongs described here from the both executive and legislative branches of the government of the DEFENDANT State, Town and City for many years. The State, Town and City have refused to take any action to redress these wrongs.

Plaintiff makes declaration that Plaintiff nor any members of Plaintiff's Tribe have ever chosen to sell the aborigine Lands to the DEFENDANT State, Town or the City, nor has it given up any of its rights over such lands.

Plaintiff has delivered proper Notice to Department of Commerce (DOC) for proper race and identity correction and on February 6, 2015 Plaintiff received un-rebutted communication from the United States (DOC) Office of Inspector General for redress of race classification correction, attached hereto as **EXHIBIT A**.

Plaintiff has brought this action against the named DEFENDANTs only because all other avenues of redress have been closed until this filing; Plaintiff again cites that the state of Rhode Island has perpetuated a system that discriminates, on grounds of race, against plaintiff by denying access to cultural habitat, cultural rights, environmental information, environmental

663    decision making, and legal redress for environmental wrongs, cultural deprivations,
664    involuntary servitude and genocide.

665

# VI REMEDY

666
667
668    Plaintiff belief that judicial remedy could and should provide that the right to environment includes
669    access to resources and confers a private cause of action to, inter alia, stop an environmentally
670    harmful action, compel an environmental audit, restore environmental harm, and pay compensation
671    for environmental damage, allowing minors, as representatives of future generations, to sue for
672    violations, right to environment into definite terms, citing that right when denying environmental
673    permits and issuing orders to close industrial plants whose pollution breaches the right, recognizes
674    that apartheid reached the right to property and provides remedies to victims whose right to
675    property was violated as a result of past racially discriminatory laws or practices, providing that
676    property rights may not be interfered with, except by a law of general application

677
678    DEFENDANTs must affirmatively seeks to undo its "deep-rooted legacy" and "institutionalism of
679    environmental racism, effected by preventing discriminatory concentration of environmental
680    burdens and ensuring equitable distribution of environmental benefits, provisions thus provide
681    concrete content against which protection from environmental racism can be measured.

682
683    DEFENDANT must affirmatively seek diverse initiatives extending strong protections against
684    environmental racism to Plaintiff's subject lands, recognizing the vulnerability of Plaintiff's
685    specific racial groups to environmental racism.

686

# VII CLAIMS AGAINST DEFENDANTS
## COUNT I

687
688
689
690    Plaintiff herein repeats, restates and incorporates by reference the allegations as mentioned above.

691
692    Under International law, ATCS, Jus Cogens and Federal common law, Plaintiff holds by right
693    aboriginal title to and the exclusive right to occupy under trust the aforementioned lands as stated
694    and described herein. This right cannot be terminated, and can only be apportioned by a plain and
695    unambiguous act of the United States Congress. There has been no such act by the United States.

696 The DEFENDANT State purported to authorize the taking of the Indian Lands by the Town and the
697 City.

698

699 By purporting to authorize the taking of the Indian Lands by the Town and City, the State intended
700 to, and did, authorize and cause the Town and the City to permanently possess the Indian Lands.
701 The State and the Town and City violated, and continue to violate, the Plaintiff' international and
702 Federal common law rights of aborigine title to and possession of the aborigine lands.

703
704 The DEFENDANT State directly lent the sovereign power of the State to establish "title" to the
705 subject lands by means of threat, murder, genocide and race misclassification, then authorizing the
706 DEFENDANT Towns to take the Plaintiff's lands.

707

708 By authorizing, ratifying and causing the authorization to the Towns to take the lands, the State
709 jointly participated in and is liable for each and every act of the Towns as well as for its own illegal
710 actions with regard to the taking and environmental destruction of the Plaintiff's lands.
711 Accordingly, Plaintiff and family members are entitled under international law the relief described
712 below.

713
714 Plaintiff is entitled to damages from the State, from the time each portion of Plaintiff's lands were
715 unjustly acquired or transferred from the Plaintiff and Plaintiff Tribe by the DEFENDANT State
716 and the Towns to the present time, with interest, in the amount of (a) the fair market rental value of
717 each relevant portion of the aboriginal lands, as improved; (b) the amount by which the value of the
718 taken lands was diminished by any damage, environmental pollution or destruction; (c) the value of
719 all minerals and other resources taken from the subject lands, equal to the price of such resources in
720 their final marketable state; and (d) any diminution in value of the lands as a result of the taking of
721 such resources.

722
723 In addition, because remedies at law are inadequate to permit full recovery by Plaintiff for the
724 harms inflicted by the DEFENDANTs, and because information concerning the damages, which
725 resulted to the Plaintiff from the illegal land transactions described above is uniquely within the
726 possession of the DEFENDANTs, Plaintiff and tribal family members are entitled to an accounting
727 by the DEFENDANTs, with interest, for the entire period from the time each portion of the lands
728 were wrongfully acquired or transferred by the DEFENDANTs until the present time.

729  Finally, because the State received benefits from its purported purchases and sales of the ancestral
730  tribal lands, including the selling of such land at a profit, the retention of which would be unjust
731  under the circumstances, Plaintiff is entitled to disgorgement of the value of those benefits, with
732  interest.
733

734  **COUNT II**

735  (Constitutional Violation of 42 U.S.C. §1983 Claim Against the State)
736  Plaintiff herein repeats, restates and incorporates by reference the allegations as mentioned above.
737
738  The States actions constitute a permanent and substantial interference with the use and enjoyment
739  of the ancestral lands by the Plaintiff and Plaintiff Tribe, amounting to a taking of an interest in the
740  aboriginal lands without compensation. The Fifth Amendment of the United States Constitution
741  prohibits the taking of property without just compensation. The taking of the aborigine lands by the
742  DEFENDANT State without compensation violates the Fifth Amendment of the United States
743  Constitution.
744

745  The taking of the Indian Lands by the DEFENDANT State without compensation deprives Plaintiff
746  of the rights, privileges and immunities secured to it by the statute of the United States of America,
747  specifically, United States Code, Title 42, Section 1983 et seq. Plaintiff has been without an
748  adequate remedy at law to compensate it for the continued invasion of its rights by the
749  DEFENDANT State.
750

751  **COUNT III**

752  (Violation of Article 1, Section 16 of the Rhode Island Constitution)
753  Plaintiff herein repeats, restates and incorporates by reference the allegations as mentioned above.
754

755  The acts of the DEFENDANT State constitute a permanent and substantial interference with the use
756  and enjoyment of the aborigine lands by the Plaintiff and Plaintiff tribal family, amounting to a
757  taking of an interest in the abovementioned lands without compensation.
758
759  Article 1 of the Rhode Island Constitution prohibits the taking of property without just
760  compensation. Plaintiff has been without an adequate remedy at law to compensate it for the
761  continued invasion of its rights by the DEFENDANT State.

**COUNT IV**

Violation of ICERD Convention

Plaintiff herein repeats, restates and incorporates by reference the allegations as mentioned above.

The acts of the State constitute a permanent and substantial interference with the right of the Plaintiff and the Plaintiff Tribe to a fair procedure, right of use to ancestral lands and territories, the right to life, food, water, health and the right to environmental protections against racial discrimination and the right to self-determined actions to establish self sustainability without infringement by DEFENDANTs et al.

Plaintiff and Plaintiff Tribe are without an adequate remedy at law to compensate it for the continued invasion of its rights by the State.

**COUNT V**

Violation of the Apartheid Convention

Plaintiff herein repeats, restates and incorporates by reference the allegations as mentioned above.

In 1789, Article 1, Section 8 of the United States Constitution gave the federal government the exclusive power to regulate commerce with the Indian tribes. The DEFENDANT State lacks jurisdiction over aborigine lands of Plaintiff. The First Congress under the Constitution enacted the Indian Trade and Intercourse Act. Section 4 of the act (the "Nonintercourse Act") expressly forbade and declared invalid any sale of Indian land without the consent and approval of the United States.

The Nonintercourse Act was a statutory restraint on alienation of Indian land and a clear manifestation of the United States federal government's intent on retaining Indian lands, including the Indian Reservation Lands, under the federal government's exclusive control. The DEFENDANT State has systematically committed acts of apartheid against plaintiff through efforts of racial separation, taking plaintiff's lands to enrich others of a different racial class, causing unending social, economic and cultural depletion of Plaintiff's rights.

The DEFENDANT State's crimes of apartheid has caused an environmental deprivations of rights, including the rights to life, health, and property; expropriating Plaintiff's property, deliberately, willfully and in bad faith violated its own federal Constitution of the United States and the

796  Nonintercourse Act in allowing for the transferring of the interest of Plaintiff' natural and ancestral
797  lands.

798

799  Plaintiff has not been able to defend or prevent under the United States laws, the Nonintercourse
800  Act or the Environmental Protection Agency laws against DEFENDANTs' environmental
801  deprivations of rights perpetuated against Plaintiff, especially the rights to life, health, and property,
802  DEFENDANTs created an environment that has forced Plaintiff to work within a system outside of
803  Plaintiff's culture and primarily for the enrichment of DEFENDANTs et al, who stole Plaintiff's
804  lands, thereby removing and destroying Plaintiff's right to life within Plaintiff' culture; Plaintiff is
805  subjected to violations of the Apartheid Convention, *supra* note 77, art. II(d) (expropriation of
806  property), art. II (e) (labor exploitation).

807

808  DEFENDANTs have committed acts in violation of the Apartheid and Genocide Conventions,
809  which establishes that discriminatory expropriation of, or interference with, property is a form of
810  environmental racism.

811
812  Plaintiff has been without an adequate remedy at law to compensate it for the continued invasion of
813  its rights by the DEFENDANT State

814

815                                   **COUNT VI**
816                              Environmental Racism
817  Plaintiff herein repeats, restates and incorporates by reference the allegations as mentioned above

818
819  The State has refused, and still refuses, to reconcile with Plaintiff, the criminal acts of taking and
820  causing environmental deprivation through racist doctrines and open and covert oppressive
821  methods, subjecting Plaintiff and Plaintiff's natural ancestral habitat to destruction and irreparable
822  harm.

823
824  The DEFENDANT State took pristine lands from the Plaintiff and has left lands of SOWAMS
825  permanently wasted and under environmental attack from waste and pollution from the many textile
826  mill run-offs and has left all the region of SOWAMS in ill repair, and with no concern for the
827  sustainable existence of Plaintiff or the many the aborigine inhabitants remaining in territory of

828 SOWAMS; the DEFENDANT State has committed systemic racial deprivation, leaving sickness
829 and death of wildlife, human inhabitants and environment.

830
831 Plaintiff and Plaintiff Tribe are without an adequate remedy at law to compensate it for the
832 continued invasion of its rights by the State.

833

834 ## DEMAND FOR RELIEF

835
836 WHEREFORE, Plaintiff respectfully pray for an order:

837 1. Right to unencumbered use of ceremonial lands and the return of other vacant lands
838 subject to environmental decay and destruction.

839 2. Return of available lands to be reserved for future generations.

840 3. Compensation from taxes collected by the State of Rhode Island for the last 150
841 years.

842 4. An apportionment of 51% of all tax revenue going forward from the final order of the
843 court.

844 5. Return of Plaintiff's principle village, currently called Mount Hope Farm held by the
845 Town of Bristol and Haffenreffer Museum held by Brown University.

846 6. Ecological reparations for the environmental destruction to air, land and water ways
847 of Plaintiff's ancestral habitat.

848 7. Re-enfranchisement of rights and implicit governance of the repair and maintenance
849 of environmentally affected lands mentioned herein as SOWAMS (Town of Bristol)
850 (Town of Warren) and (Town of Barrington).

851 8. Obligate DEFENDANTs et al to consider the environmental interests of Plaintiff and
852 hold DEFENDANTs accountable for historic inequities in such decisions of
853 deprivation against Plaintiff's rights as mentioned above, providing environmental
854 justice in the right to participate as equal partners at every level of decision-making
855 including needs assessment, planning, implementation, enforcement and evaluation of
856 toxic ancestral lands inhabited by Plaintiff and Plaintiff's family members.

857 9. Declaring that the Indian Lands were acquired or transferred from the Plaintiff and
858 Plaintiff Tribe in violation of Federal and State law, and that any so-called taking or
859 transferring of Indian Lands was void *ab initio*;

10. Declaring that Plaintiff and Plaintiff Tribe are the owners of, and have the legal and equitable title, as well as the right to use and possess, the aborigine lands claimed or held by any DEFENDANT or member of the Landholder Class;

11. Awarding such declaratory and injunctive relief as necessary to effectuate Plaintiff and Plaintiff's family's right to possession, to which the proof demonstrates their entitlement;

12. Awarding Plaintiff and Plaintiff Tribe damages, and interest thereon, as described above in the complaint;

13. Requiring an accounting by the Landholder Class, the State, Town and the City, with interest, as described above in this complaint;

14. Requiring the DEFENDANTs et al to disgorge the benefits they have received from their illegal purchases, sales and possessions of the subject lands, with interest;

15. Awarding such other and further relief, both special and general, at law or in equity, as the Court may deem just and proper.

Plaintiff

*William Winds of Thunder Guy*

William Winds of Thunder Guy,
Sagamore of the Pokanoket Nation
Pokanoket Tribal Trust

_____

STATE OF RHODE ISLAND}
COUNTY OF BRISTOL}

VERIFICATION

I, William Winds of Thunder Guy, verify that I have developed and submitted the allegations contained in the Verified Complaint, that I have personal knowledge of the facts, and that the facts stated in the Verified Complaint are true, except those facts alleged upon information and belief, as to those facts, I believe they are true. Further, the use of a NOTARY is not accepted by Plaintiff as an adhesion to any United States legislative contracts applied to the use of a NOTARY.

*William Winds of Thunder Guy*

William Winds of Thunder Guy

894    The foregoing instrument was acknowledge before me this _18th_ day of June, 2016, by

895    William Winds of Thunder Guy, who personally appeared before me and acknowledged the above

896    to be his free act and deed.

897

898    _____

899    Notary Public

900    My Commission Expires: 7-19-2020